**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **REBECCA CIMBAT,**<br>           **Plaintiff,** | **CIVIL ACTION** |
| **v.** | |
| **OLD NAVY LLC, IKEA L. LYNCH,**<br>           **Defendants.** | **NO.  21-2657** |

<u>**MEMORANDUM OPINION**</u>

Plaintiff Rebecca Cimbat was assaulted by Defendant Ikea Lynch while shopping at a retail store of Defendant Old Navy, LLC ("Old Navy").  Cimbat brings two claims against Old Navy: negligence and intentional infliction of emotional distress (IIED) on the grounds that Old Navy failed to adequately warn and protect Cimbat from Lynch and failed to adequately train its employees to respond to such situations.[1]  Old Navy filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.  For the reasons that follow, the Motion will be granted as to Plaintiff's IIED claim but denied as to the negligence claim.

**I.    FACTUAL BACKGROUND**

On October 31, 2018, Rebecca Cimbat was spit on, punched, and kicked in the head by another customer, Ikea Lynch, at Old Navy's store in Fairless Hills, Pennsylvania.

The chain of actions leading up to the physical altercation began about 20 minutes beforehand when Cimbat approached Lynch after she observed Lynch attempting to shoplift clothing.  Cimbat told Lynch to stop what she was doing.  When Lynch responded "You don't work here," Cimbat retorted that she did (when in fact she did not).  Cimbat soon went up to the register where she told a store employee about Lynch and the attempted shoplifting.  That employee advised the store manager, Danielle DeMarco, who told Cimbat that the employees

---

[1] Defendant Lynch has not filed any responsive pleading or other court filing in this case.

were aware of Lynch and that the matter would be handled.  Lynch then disappeared from Cimbat's view, going into the fitting room area in the center of the store, and Cimbat resumed shopping.  As she testified, "I was led to believe now they were in control of it, they had a handle on it and I could go about my business."

While Lynch was in a fitting room, DeMarco heard Cimbat shout loudly from elsewhere in the store something along the lines of: "How are you just going to let her take that stuff where I have to pay for it?"  By this time, DeMarco had learned from another employee that Lynch was "messing with the [price tag] gun in the fitting room," putting the employees "on alert."[2]  When Lynch left the fitting room, a store employee counted the items she had brought in to make sure no items had been hidden away, and Lynch proceeded to walk around the store.  At some point, DeMarco was also told that Lynch appeared to be under the influence of drugs or alcohol.[3]

Roughly 20 minutes after their initial conversation, Lynch reapproached Cimbat while Cimbat was in the checkout line and, according to Cimbat's testimony, said, "You don't work here," and spat in her face.  Cimbat reacted by raising her hand in a closed first and swinging it towards Lynch, attempting to get Lynch "out of [her] space."[4]  Lynch then punched Cimbat and, after Cimbat fell to the ground, proceeded to kick her.  After the assault, Lynch left the building,

---

[2] It is not clear from the record and briefing whether DeMarco was informed by another employee that Lynch was playing with a price tag gun in the fitting room area before or after Cimbat reported the potential shoplifting.  The incident report prepared by DeMarco states that the fitting room associate informed her first.  But Cimbat's briefing states, and Old Navy does not dispute, that "Demarco [sic] learned from another employee . . . that Lynch was messing with a tag gun in the fitting room" "[a]fter speaking with Plaintiff."  In either case, Old Navy employees were aware of Lynch and her potential shoplifting prior to her assault on Cimbat.

[3] DeMarco testified she herself did not witness Lynch being under the influence and was not sure whether she or other employees knew Lynch was under the influence "in the moment," or if it was a fact "assumed . . . after the incident."

[4] Cimbat claims she was not the aggressor at any time but rather only sought to defend herself.  A video showing part of the incident shows Cimbat raising her hand in a fist and thrusting it towards Lynch.  Cimbat testified that she did not make contact with Lynch ("Even if I made contact with her I couldn't have hurt her.").

and police officers and paramedics arrived (a store employee having called 911 during the

assault).

DeMarco, utilizing information provided by other store employees, prepared an incident

report which stated:

> The customer let us know that another customer was shoving things her jacket.
> We were already onto this customer because my fitting room associate caught her
> in the fitting room cubbie looking playing with our tag attacher gun. (The shop
> lifting customer had appeared to be under the influence) The customer let us
> know that this lady was shoplifting and we continues to customer service. The
> women knew we were on to her so she pulled out her stuff and dropped it in the
> quick change room. The customer who originally told us about her was online
> paying. The shoplifter walked around and when she was about to head out she
> came up to the register where the customer was paying. She told the customer
> "That's not your job" and spit in the customers face. The customer then went
> towards her and the shoplifter punched her straight in the Right side of the cheek.
> The shoplifted then seemed like she was gong to steal her purse but she emptied
> it. My employee tried to stop her at the door but she went after him and I told him
> to let her go. We tried to get license plate but she put a red scarf over the license
> plate. It was a black Hyundai Sonta.

## II.   LEGAL STANDARDS

### A.  Summary Judgment

A party is entitled to summary judgment if it shows "that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Inferences to be drawn from the underlying facts

contained in the evidential sources must be viewed in the light most favorable to the party

opposing the motion." *Peters Twp. Sch. Dist. v. Hartford Acc. & Indem. Co.*, 833 F.2d 32, 34

(3d Cir. 1987).

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52). "The non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Id.* (citation omitted).  A moving party is entitled to judgment as a matter of law where the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323.

## III.    DISCUSSION

### A.  Intentional Infliction of Emotional Distress

To prove a claim for IIED under Pennsylvania law, a plaintiff must sufficiently prove that: (1) the defendant's conduct was "extreme and outrageous," (2) was intentional or reckless, and (3) caused "emotional distress" that was (4) "severe."  *Chuy v. Phila. Eagles Football Club*, 595 F.2d 1265, 1273-74 (3d Cir. 1979) (en banc); Restatement (Second) of Torts § 46(1) (1965); *see also Taylor v. Albert Einstein Med. Ctr.*, 754 A.2d 650, 652 (Pa. 2000).  "As a preliminary matter, it is for the court to determine if the defendant's conduct is so extreme as to permit recovery."  *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988).  Conduct is "extreme and outrageous" where it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998) (citation omitted); *see* Restatement (Second) of Torts § 46 cmt. d (1965).  These prerequisites have tightly circumscribed the instances of recovery for IIED.  *See, e.g.*, *Cox*, 861 F.2d at 395; *Rinehimer v.*

*Luzerne Cnty. Cmty. Coll.*, 539 A.2d 1298, 1305 (Pa. Super. 1988).

Old Navy's conduct as described here is not of the same category as that "deemed sufficiently outrageous to constitute IIED [which] includes: (1) killing the plaintiff's son with an automobile and then burying the body, rather than reporting the incident to the police; (2) intentionally fabricating documents that led to the plaintiff's arrest for murder; and (3) knowingly releasing to the press false medical records diagnosing the plaintiff with a fatal disease." *Dull v. W. Manchester Twp. Police Dep't*, 604 F. Supp.2d 739, 756 (M.D. Pa. 2009) (citing *Hoy*, 720 A.2d at 754).

Additionally, Cimbat's IIED claim does not survive to the extent that it relies on allegations that Old Navy failed to adequately warn, act, or train, in that there is no evidence in the record that Old Navy acted intentionally or recklessly in this regard. "'[I]ntentional' conduct involves 'knowledge on the part of the actor that *severe emotional distress is substantially certain to be produced by his conduct*.'" *Doe v. Moravian Coll.*, 2021 WL 843603, at *4 (E.D. Pa. Mar. 5, 2021) (quoting *Hoffman v. Mem'l Osteopathic Hosp.*, 492 A.2d 1382, 1386 (Pa. Super. 1985)). And "'reckless' conduct . . . is when the actor knows or has reason to know of 'facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.'" *Id.* (quoting Restatement (Second) of Torts § 500 (1965)). Section 46 provides further: "The rule stated in this Section applies where the actor desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct. It applies also where he acts recklessly, as that term is defined in § 500, in deliberate disregard of a high degree of probability that the emotional distress will follow." Restatement (Second) of Torts § 46 cmt. *i* (1965).

Failure to act does not generally provide grounds for IIED liability. *Jackson v. Sun Oil Co. of Pa.*, 521 A.2d 469, 471 (Pa. Super. 1987); *see L.H. v. Pittston Area Sch. Dist.*, 130 F. Supp.3d 918, 930-31 (M.D. Pa. 2015), *aff'd*, 666 F. App'x 213 (3d Cir. 2016). While evidence supports that employees were on notice that Cimbat had already approached Lynch and accused her of shoplifting and that Lynch may have been under the influence while attempting to shoplift, Cimbat's evidence does not demonstrate that the employees proceeded with "deliberate disregard" by failing to warn or take further precaution in the face of a substantial risk or high probability of emotional distress.

### B. Negligence

The same cannot be said of Plaintiff's negligence claim. Under Pennsylvania law, a plaintiff must prove four elements to sustain a negligence claim: "(1) a duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct for the protection of others against unreasonable risks; (2) a failure to conform to the standard required; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting in harm to the interests of another." *Kovalev v. Walmart Inc.*, 2022 WL 6775714, at *3 (E.D. Pa. Oct. 11, 2022) (quoting *Nw. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 139 (3d Cir. 2005)).

### i. Duty and Breach

As to Old Navy's duty as owner of the store premises, the "standard of care a possessor of land owes to one who enters upon the land depends upon whether the person entering is a trespasser, licensee, or invitee." *Carrender v. Fitterer*, 469 A.2d 120, 123 (Pa. 1983). A business invitee is "a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land." *Palange v. City of*

*Philadelphia*, 640 A.2d 1305, 1308 (Pa. Super. 1994).  "The duty owed to a business invitee is the highest duty owed to any entrant upon land.  The landowner is under an affirmative duty to protect a business visitor not only against known dangers but also against those which might be discovered with reasonable care."  *Truax v. Roulhac*, 126 A.3d 991, 997 (Pa. Super. 2015) (en banc) (citation omitted).  Here there is no dispute that Cimbat was a business invitee to Old Navy's retail store.  Old Navy thus owed a duty to Cimbat as a business invitee.

The standard of duty owed to an invitee to protect from harms caused by third persons (*e.g.*, other invitees) is as follows:

> A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to (a) discover that such acts are being done or are likely to be done, or (b) give a *warning* adequate to enable the visitors to avoid the harm, or otherwise to *protect* them against it.

Restatement (Second) of Torts § 344 (1965) (emphasis added); *see also Moran v. Valley Forge Drive-In Theater, Inc.*, 246 A.2d 875, 878 (Pa. 1968); *Truax*, 126 A.3d at 997-98; *Reason v. Kathryn's Korner Thrift Shop*, 169 A.3d 96, 102 (Pa. Super. 2017).  The duty to protect business invitees against third parties arises only where the "owner has reason to anticipate such conduct."  *Truax*, 126 A.3d at 998.  The Restatement lays out scenarios in which an owner might have such reason:

> Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.

7

Restatement (Second) of Torts § 344 cmt. F (1965).  Another way to express the requirement is to ask whether the harm was reasonably foreseeable to the owner.  *See Truax*, 126 A.3d at 998.

Here, a reasonable juror could find that Old Navy did not exercise reasonable care to give a warning to Cimbat to enable her to avoid harm or take further precautions to protect her against Lynch.  Cimbat presents evidence suggesting that Old Navy employees had reason to know that Lynch could be dangerous, particularly to Cimbat.  In the light most favorable to Cimbat, the evidence shows that roughly 20 minutes before the assault Cimbat and Lynch engaged in an altercation about Lynch's shoplifting which Cimbat reported to store employees, thus putting them on notice of the situation.  Additionally, store employees observed that Lynch was likely under the influence of drugs or alcohol.

In light of such evidence, a reasonable juror could find that Old Navy had "reason to know" that harm was "about to occur" and failed to exercise reasonable care by failing to "give a warning adequate to enable [Cimbat] to avoid the harm, or otherwise to protect [her] against it." Restatement (Second) of Torts § 344 & cmt. f (1965).  Therefore, the issue of whether Old Navy breached its duty to Cimbat is one for the jury.  *See Paulos v. Nordstrom Rack*, 2021 WL 3471164, at *1 (E.D. Pa. Aug. 6, 2021) ("[I]ssues of negligence and causation are generally questions for the jury." (citing *Pa. R.R. Co. v. Rogers*, 244 F. 76, 78 (3d Cir. 1917))).

Similarly, both Cimbat and Old Navy have marshalled evidence that weighs on whether Old Navy's employees at the Fairless Hills location were adequately trained on how to handle similar situations as well as evidence bearing on whether the past experience and character of the business was such that Old Navy should have reasonably anticipated conduct similar to Lynch's. Cimbat, for instance, points to evidence that store employees were not trained on how to handle intoxicated customers, and testimony from DeMarco and Walker supports that there were prior

shoplifting incidents as well as incidents involving arguments between customers over potential shoplifting.  At the same time, DeMarco testified that she was trained on different scenarios involving escalated customers and testified as to some strategies for handling shoplifters. Walker also testified that Old Navy trained him on escalated customer situations.

Given that such evidence, in the light most favorable to Cimbat, suggests that Old Navy should have reasonably anticipated similar conduct and failed to take adequate "precautions against it," Restatement (Second) of Torts § 344 cmt. f (1965), the issue is one for the jury.  *See Paulos*, 2021 WL 3471164, at *1; *Truax*, 126 A.3d at 1000 ("Summary judgment is inappropriate in premises liability cases involving business invitees where the evidence establishes a *prima facie* case that the third party's accidental, negligent, or intentional conduct was reasonably foreseeable to the occupant of the premises."); *id.* ("Under Pennsylvania law, the issue of whether a defendant has breached its duty is normally submitted to the jury.").

### ii.    *Causation and Harm*

As to harm, it is not disputed that Cimbat suffered actual harm from the assault.[5]  Thus, it is only necessary to determine whether Cimbat can show the requisite causation.  Old Navy argues that Cimbat's own actions during the initial verbal altercation with Lynch (where she misrepresented that she was a store employee) and her defensive action during the assault (swinging her closed fist at Lynch) renders any negligence on Old Navy's part too remote to serve as a proximate cause of Cimbat's injuries—in effect arguing that Cimbat's own actions are

---

[5] Cimbat testified that she had "hematomas all over [her] face for a year" and that she has a "lump" near her eye as a result.  Cimbat provides evidence of such injuries, including photographs showing extensive bruising around her right eye in addition to numerous medical records.  Additionally, Cimbat claims to have experienced "mental anguish" and was fearful for "months . . . she was going to come get me."  Cimbat testified further: "[N]ow I'm afraid of every black woman at the age of 24 to 30 that comes near me, because I don't even remember what she looks like.  My husband and daughter escorted me to every store for I think they got sick of it after six months. . . ." Cimbat stated, however, she had not seen any specialist regarding her mental distress.

an intervening and superseding cause, vitiating Old Navy's liability.

"Causation in fact is normally a question for the jury, but proximate cause poses questions of law which require the court to determine whether the defendant's negligence was so remote that, as a matter of law, he cannot be held liable for the harm which subsequently occurred." *Redland Soccer Club, Inc. v. Dep't of Army*, 55 F.3d 827, 851 (3d Cir. 1995). The question of whether an action (or inaction) is the proximate cause of an alleged harm boils down to "whether the defendant's conduct was a 'substantial factor' in producing the injury." *Vattimo v. Lower Bucks Hosp., Inc.*, 465 A.2d 1231, 1233 (Pa. 1983).

Here, the alleged negligence is not too remote to constitute proximate cause, and jurors may reasonably differ as to whether the alleged negligence is a "substantial factor" contributing to Lynch's assault against Cimbat. *See Ozer v. Metromedia Rest. Grp., Steak & Ale of Pennsylvania, Inc.*, 2005 WL 525400, at *3 (E.D. Pa. Mar. 7, 2005) ("Although the issue of proximate cause is a question of law, the Pennsylvania Supreme Court has instructed that the question of whether a defendant's conduct was a substantial or an insignificant cause of a plaintiff's harm 'should not be taken from the jury if the jury may reasonably differ' as to the question." (citation omitted)). Similarly, while Cimbat's own actions might be other "factors which contribute in producing the harm," Restatement (Second) of Torts, § 433 (1965), whether those intervening actions constitute a proximate cause of the injury is a question for the jury. *See Malitovsky v. Harshaw Chem. Co.*, 61 A.2d 846, 848 (Pa. 1948) ("Ordinarily it is for the jury to determine whose negligence, of several persons contributing to the injury, was the proximate cause.").

Because Old Navy had a duty to Cimbat as a business invitee and Cimbat has presented sufficient facts by which a reasonable juror could conclude that Old Navy was negligent and its

negligence was the proximate cause of Cimbat's injury, her negligence claim survives summary judgment.

An appropriate order follows.

**BY THE COURT:**

**/s/Wendy Beetlestone, J.**

_____

**WENDY BEETLESTONE, J.**